# EXHIBIT A

Contract between 89 Degrees and the Debtor.

## MASTER INDEPENDENT CONTRACTOR AGREEMENT

This Master Independent Contractor Agreement (the "Agreement") is effective April 1, 2012 ("Effective Date") between Gregg Appliances, Inc., with principal offices located at 4151 East 96th Street Indianapolis, Indiana 46240, its subsidiaries and affiliates (collectively "hhgregg") and 89 Degrees, Inc. ("Contractor"), with principle offices located at 25 Burlington Mall Road, Suite 610 Burlington, MA 01803. The parties agree as follows:

### 1. Services; Term.

1.1 hhgregg engages Contractor to provide the Services described in one or more Project Description Schedules that the parties may execute from time to time during the term of this Agreement. The term of this Agreement shall begin on the Effective Date and shall continue until terminated in accordance with Section 12 below.

1.2 A Project Description Schedule will be executed by both parties for each project, referencing this Agreement and setting forth, at a minimum, a description of the services to be performed (the "Services") and the agreed-upon Project Fee for such Services. The parties shall use the Project Description Schedule form attached hereto.

1.3 As used herein, "Agreement" includes this Agreement and any Project Description Schedule signed by the parties. In the event of any conflict or inconsistency between this Agreement and a Project Description Schedule, the terms of the Project Description Schedule shall control.

### 2. Payment.

2.1 As full consideration for the performance of the Services specified in each Project Description Schedule and the assignment of rights in the Work Product to hhgregg as provided herein, hhgregg shall pay Contractor the amount agreed upon and specified in the Project Description Schedule ("Project Fee").

2.2 Contractor shall invoice hhgregg from time to time for all Services performed to hhgregg's project requirements and in an applicable Project Description Schedule or to be performed by Contractor as specified in the applicable Project Description Schedule. hhgregg shall pay the undisputed invoiced amount within thirty days (30) days after receipt of a written invoice from Contractor. Any undisputed invoiced amount that is not paid by hhgregg to Contractor when due shall incur a late fee at the rate of one-half percent (.5%) per month or the maximum rate permitted by law, whichever is less, from the date such undisputed amount became due through the date on which payment is received by Contractor. Notwithstanding anything to the contrary in this Agreement, all rights granted to hhgregg under this Agreement in and to the Work Product are contingent upon hhgregg's payment in full of all undisputed Project Fees due hereunder.

2.3 Contractor shall maintain, during and for at least two (2) years after completion of the applicable Services, adequate records of all project costs (including time records) and reimbursable expenses incurred in the performance of the Services. hhgregg shall have the right to audit such records at reasonable times and upon reasonable notice to verify the accuracy of the amounts billed to hhgregg.

2.4 Each party will be responsible for its own taxes, including property taxes, income taxes on its business and, any other taxes incurred by such party in connection with its business and with the performance of its obligations hereunder.

### 3. Independent Contractor Status.
Contractor is an independent contractor for all purposes, without express or implied authority to bind hhgregg by contract or otherwise. Contractor agrees that neither Contractor nor Contractor's Assistants (defined in Section 4.1 of this Agreement) are agents or employees of hhgregg, and that Contractor and Contractor's Assistants are not entitled to any employee benefits of hhgregg, including, without limitation, health insurance, disability benefits, pensions, annuities, death benefits, and savings plans. As Contractor is not hhgregg's employee, hhgregg shall have no

{M0400114.1 }

responsibility to pay or withhold from any payment to Contractor under this Agreement any federal, state or local taxes or fees.

## 4. Contractor's Assistants.

4.1 Contractor may, at Contractor's own expense, employ such persons as Contractor deems necessary to provide the Services. As used herein, "Contractor's Assistants" includes Contractor's employees, agents and subcontractors. Contractor shall be solely responsible for the performance of Contractor's Assistants; provided, however, hhgregg shall have the right to remove any Contractor Assistant at any time upon providing Contractor written notice. Contractor's Assistants shall comply with all applicable Terms and Provisions of this Agreement.

4.2 Contractor shall be solely and fully responsible for paying any taxes, FICA, or other amounts required to be withheld on behalf of Contractor's Assistants by any governmental entity or authority having jurisdiction over the matter. Contractor's Assistants shall comply with all of the Terms and Provisions of this Agreement.

## 5. Warranties.

5.1 Contractor represents and warrants that the Services provided hereunder shall be performed (a) in a professional, workmanlike manner, and (b) in conformance with generally accepted industry standards prevailing at the time, all applicable laws, rules and regulations promulgated by an authority of competent jurisdiction, and all applicable specifications and documentation set forth in the applicable Project Description Schedule.

5.2 Contractor represents and warrants that (a) it has full power and authority to enter into this Agreement and grant hhgregg all of the rights granted hereunder, and (b) the performance of this Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction to which Contractor is bound.

## 6. Indemnity.
Contractor shall indemnify and hold harmless hhgregg and its officers, directors, agents and employees (the "Indemnitees"), against all third party claims, liabilities, damages, losses and expenses, including attorneys' fees and costs of suit arising from: (a) Contractor's breach or violation of any material term of this Agreement, (b) Contractor's gross negligence or intentional misconduct, (c) Contractor failing to satisfy any applicable Internal Revenue Service's guidelines for an independent contractor, and (d) any claim by a third party against hhgregg alleging that the Services or the Work Product infringe a patent, copyright, trademark, trade secret or other proprietary right of a third party (the "Claims") and, at hhgregg's request, defend the Indemnitees against any Claims. Contractor shall not settle any such suits or Claims without hhgregg's prior written approval, such approval not to be unreasonably withheld. To the extent that there is a good faith dispute regarding the Contractor's obligations to indemnify hhgregg hereunder and such dispute is resolved in favor of hhgregg, then Contractor agrees to reimburse hhgregg for all documented, out-of-pocket costs incurred by hhgregg in enforcing this indemnity, including reasonable attorneys' fees and costs of suits. The foregoing indemnity shall be conditioned upon hhgregg (i) promptly notifying Contractor in writing of any such Claims for which indemnification is sought, (ii) permitting Contractor to control, and cooperate with hhgregg in, the defense or settlement of such Claims, and (iii) having the right to provide for its separate defense at its own expense.

## 7. Expenses; Supplies.
Except as otherwise specified in a Project Description Schedule or as otherwise mutually agreed upon by the parties, Contractor shall be responsible for all costs and expenses incident to completing the Services and shall provide Contractor's own supplies and equipment.

## 8. Nonexclusive Agreement.
This Agreement is not an exclusive agreement. hhgregg is free to engage others to perform services the same as or similar to Contractor's. Contractor is free to advertise, offer and provide Contractor's services to others, provided that Contractor does not breach its obligations hereunder.

## 9. Confidentiality.

9.1 Contractor and hhgregg each acknowledge that it may disclose certain of its Confidential Information (in its capacity as a discloser of its own Confidential Information, such party hereinafter referred to as a

"Disclosing Party") to the other (in its capacity as a recipient of the Disclosing Party's Confidential Information, such party hereinafter referred to as a "Receiving Party") in connection with the Services performed hereunder. For the purposes of this Agreement, the term "Confidential Information" includes without limitation all information, whether written or oral and in any form, relating to either party's research, development, products, methods of manufacture, trade secrets, business plans, customers, vendors, finances, personnel data, Work Product (defined in Section 10 of this Agreement), and other material or information considered proprietary by a party or otherwise relating to the current or anticipated business or affairs of such party. Confidential Information also includes any third party's proprietary or confidential information disclosed to hhgregg or Contractor. For the purposes of this Agreement, Confidential Information does not include information (i) that a Receiving Party lawfully knew without restriction prior to disclosure thereof by the Disclosing Party, as evidenced by relevant appropriate documentation, (ii) that is or becomes publicly known through no wrongdoing of a Receiving Party, (iii) that a Receiving Party developed independently without use of the Disclosing Party's Confidential Information, as evidenced by appropriate documentation, or (iv) that is hereafter lawfully furnished to a Receiving Party by a third party without restriction on disclosure. Notwithstanding the foregoing, a Receiving Party may disclose the Confidential Information of a Disclosing Party, to the extent that such Confidential Information is required to be disclosed pursuant to an order or requirement of a court, government agency or law of competent jurisdiction, provided that the Receiving Party gives prompt written notice to the Disclosing Party of such requirement prior to disclosure.

9.2   In its capacity as a Receiving Party, each party hereby agrees during the term of this Agreement and for five (5) years following termination of this Agreement not to copy (except with the Disclosing Party's prior written consent) or directly or indirectly disclose to any third party any of the Receiving Party's Confidential Information. Notwithstanding the foregoing, the Receiving Party shall treat as confidential and shall not, directly or indirectly, disclose or otherwise make available any of the Disclosing Party's Confidential Information that is accorded "trade secret" status under any applicable law for as long as such Confidential Information shall remain a "trade secret" under such law.   Without limiting the scope of this Section 9.2, Contractor agrees to limit its internal distribution of hhgregg Confidential Information to Contractor's Assistants who have a need to know solely in order to effectuate the applicable Project Description Schedule and to take steps to ensure that the dissemination is so limited, including the execution by Contractor's Assistants of agreements with provisions at least as restrictive as those set forth herein. Each party in its capacity as a Receiving Party will take all reasonable measures to protect the Disclosing Party's Confidential Information, including, at a minimum, those measures that it uses to protect its own information of a similar nature.   Receiving Party shall use the Disclosing Party's Confidential Information only in furtherance of this Agreement or in the course of performing the Services hereunder and not for its own benefit or for the benefit of any third party.

9.3   In its capacity as a Receiving Party, each party hereby agrees not to alter, decompile, disassemble, reverse engineer or otherwise modify any of the Disclosing Party's Confidential Information (except at the express direction of such Disclosing Party in connection with performing the Services), and the mingling, if any, of any Confidential Information with information of the Receiving Party shall not affect the confidential nature or ownership of the same. Except as required by hhgregg in connection with the Services, Contractor agrees not to design or manufacture any products that incorporate hhgregg Confidential Information.

9.4   All Confidential Information is and shall remain the property of the applicable Disclosing Party, and the Receiving Party shall have no rights, by license or otherwise, in the Disclosing Party's Confidential Information, except as expressly provided herein. Upon the earlier of a Receiving Party's receipt of a written request or the termination of this Agreement, such Receiving Party shall return or destroy all Confidential Information of the Disclosing Party, including all copies, excerpts and summaries thereof.

## 10.   **Ownership of Work Product.**

10.1   All rights, title and interests in and to any works, technology, trade secrets, know-how, Confidential Information, or other intellectual property developed or acquired by Contractor prior to the Effective Date, or independent of Contractor's performance of the Services (the "Prior IP") shall remain the sole and exclusive property of Contractor, except as otherwise expressly set forth herein. For purposes of this Agreement, "Work Product" shall include, without limitation, all original designs, discoveries, creations, works, work in progress, deliverables, inventions, products, computer programs, procedures, processes,

improvements, developments, drawings, notes, documents, information and materials all to the extent made, conceived or developed by Contractor alone or with others solely on behalf of hhgregg and as a result of the Services performed hereunder. For the purposes of this Agreement, the Work Product shall expressly exclude the Prior IP. Subject to hhgregg's payment of all undisputed Project Fees properly owed Contractor, all Work Product shall be the sole and exclusive property of hhgregg. In this regard, Contractor hereby agrees to irrevocably assign and transfer to hhgregg, and contingent upon hhgregg's payment of all applicable Project Fees properly owed Contractor, does hereby assign and transfer to hhgregg, all of its worldwide right, title and interest in and to the Work Product, including all associated intellectual property rights therein. hhgregg will have the sole right to determine the treatment of any Work Product, including the right to keep it as trade secret, and to file applications for patents and copyright and trademark registrations. Contractor agrees (a) to disclose promptly in writing to hhgregg all Work Product, (b) to cooperate with and assist hhgregg to apply for and execute any applications and/or lawful assignments reasonably necessary to obtain any patent, copyright, trademark or other statutory protections for the Work Product in hhgregg's name as it deems appropriate, and (c) to otherwise treat all Work Product as hhgregg Confidential Information as described above.

10.2   Moral Rights Waiver. "Moral Rights" means any right to claim authorship of a work, any right to object to any distortion or other modification of the work, and any similar right, existing under the law of any country in the world or under any treaty. Contractor hereby irrevocably transfers and assigns to hhgregg any and all Moral Rights that it may have in any of the Work Product. Contractor also hereby forever waives and agrees never to assert against hhgregg, its successors or licensees, any and all Moral Rights Contractor may have in any Work Product, even after termination of this Agreement.

10.3   Contractor will ensure that Contractor's Assistants that render Services pursuant to an applicable Project Description Schedule have entered into one or more written agreements whereby such Contractor's Assistants appropriately waive any and all claims and, consistent with the terms of this Agreement, assign any and all rights or any interests in any Work Product created in connection with this Agreement.

10.4   hhgregg will not have rights to any Prior IP or work product conceived or reduced to practice by Contractor that was developed entirely on Contractor's own time without using equipment, supplies, facilities or trade secrets or hhgregg Confidential Information.

11.   **Access to hhgregg's Systems.** Contractor shall implement and strictly comply with procedures for the security of hhgregg's computer systems that Contractor is made aware of verbally or in writing, and will terminate access to such systems whenever Contractor ceases to have a need to know such systems. Contractor will not tamper with, compromise, or attempt to circumvent or bypass any security pertaining to hhgregg's systems, electronic or otherwise (collectively, the "Security Violations"). Contractor assumes responsibility and liability for any access to hhgregg's systems by or through its computers arising out of or resulting in any Security Violation. Contractor will use commercially reasonable efforts to assure that any linkage and/or access to hhgregg's systems will not cause or allow entry of any virus or any other contaminant, including without limitation codes, commands, or instructions that may be used to access, alter, delete, damage, or disable the systems, other software, information, or other property.

12.   **Termination.**

12.1   hhgregg may terminate this Agreement at any time for any reason upon providing ninety (90) days' written notice to Contractor. If Services are being provided pursuant to a Project Description Schedule in force at the time, Contractor shall cease to perform the Services on the date of termination, and hhgregg shall be obligated to pay Contractor only for those Services satisfactorily performed through the date of termination.

12.2   hhgregg may terminate this Agreement if Contractor fails to perform or otherwise breaches any material provision of this Agreement and fails to cure the breach within ten (10) days after receiving written notice of the breach from hhgregg. In the event of such termination for breach, hhgregg shall have no liability to pay Contractor for Services performed through the date of termination.

12.3   Contractor may terminate this Agreement upon written notice to hhgregg at any time for any reason if no Services are being provided pursuant to a Project Description Schedule in force at the time. If a Project Description Schedule is in force, then until such Project Description Schedule is completed, Contractor

may terminate this Agreement only if hhgregg fails to perform or otherwise breaches any material provision of this Agreement and fails to cure the breach within thirty (30) days after receiving notice of the breach from Contractor. Notwithstanding the foregoing, in the event that hhgregg materially breaches its obligations hereunder, including the payment of any undisputed Project Fees properly owed Contractor, in addition to any other rights as it may have in law and equity, Contractor may immediately suspend performance of the applicable Services until such breach is cured, or otherwise terminate the Agreement if hhgregg fails to cure such breach within the applicable thirty (30) day notice period set forth herein.

12.4 Upon the termination of this Agreement for any reason: (a) each party will be released from all obligations to the other arising after the date of termination, except those that by their terms survive such termination; and (b) Contractor will promptly notify hhgregg of any Work Product in Contractor's possession and, at the expense of Contractor and in accordance with hhgregg's instructions, deliver to hhgregg all such Work Product and return or destroy all hhgregg Confidential Information.

13. **Limitation of Liability.** WITH THE EXCEPTION OF BREACHES OF SECTION 9 AND THE INFORMATION SECURITY COMPLIANCE ADDENDUM OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER OR ANY THIRD PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER OR NOT SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. WITH THE EXCEPTION OF BREACHES OF SECTION 9 OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY'S LIABILITY TO THE OTHER IN ANY ACTION WHATSOEVER, WHETHER GROUNDED IN TORT, CONTRACT, NEGLIGENCE OR ANY OTHER THEORY OF LAW OR IN EQUITY, EXCEED THE AMOUNT ACTUALLY PAID TO CONTRACTOR FOR THE SERVICES RENDERED HEREUNDER.

14. **Force Majeure.** Neither party shall be liable for any delay or failure in performance due to causes beyond the reasonable control of that party.

15. **Injunctive Relief.** Contractor agrees that its obligations and promises under this Agreement are of a unique, intellectual nature giving them particular value. Contractor further agrees that Contractor's breach of any of the promises or agreements contained in this Agreement may result in irreparable and continuing damage to hhgregg for which there will be no adequate remedy at law, and in the event of such breach hhgregg will be entitled to seek injunctive relief, or a decree of specific performance, or both, and such other and further relief as may be proper (including monetary damages if appropriate).

16. **Assignment.** Contractor may not assign or transfer this Agreement in its entirety or in parts, any of Contractor's rights or obligations under this Agreement (i) to any affiliate, assignee, or (ii) a successor or surviving entity or corporation following a change in control without the prior written consent of hhgregg, except as set forth in Section 4 above; provided, however that Contractor may, without hhgregg's consent, assign this Agreement in its entirety only, its rights, obligations and interests hereunder (i) to an affiliate, assignee, or (ii) to a successor or surviving entity or corporation following a change in control; provided, in each case above, that the affiliate, assignee, or (ii) a successor or surviving entity or corporation agrees in writing to both Contractor and hhgregg to be bound by the terms of this Agreement.

17. **Severability.** If any provision of this Agreement is deemed to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

18. **Waiver.** No failure to enforce any covenant, term or condition of this Agreement shall be construed as a waiver of any breach of any other covenant, term or condition.

19. **Notices.** Any notices required to be given under this Agreement shall be sufficient if given in writing and delivered in person, sent by certified mail, return receipt requested, or by commercial overnight courier, addressed to the respective parties at the address set forth on the first page hereof, or such other address as a party may, from time to time, designate in writing. Notices shall be effective when received.

**20.** **Survival of Obligations.** All provisions hereof that by their nature should extend beyond the termination of this Agreement, including, without limitation warranties, taxes, indemnity, confidentiality, ownership of Work Product, and Moral Rights waiver shall survive the termination of this Agreement.

**21.** **Governing Law.** This Agreement shall be construed, interpreted and enforced according to the laws of the State of Indiana, excluding its conflict of law rules, and shall have jurisdiction and venue over all controversies arising out of or relating to this Agreement.

**22.** **Insurance.**

22.1 Required Insurance Coverage. Contractor shall obtain, pay for and maintain in full force and effect during the term of this Agreement, insurance as follows:

 A. Workers' compensation and employers' liability insurance with limits to conform with the greater of the amount required by Indiana law or One Million Dollars ($1,000,000) each accident, including occupational disease coverage;

 B. Commercial general liability insurance with limits not less than Two Million Dollars ($2,000,000) combined single limit for bodily injury, death, and property damage, including personal injury, contractual liability, independent contractors, broad-form property damage, and products and completed operations coverage;

 C. Commercial automobile liability insurance with limits not less than One Million Dollars ($1,000,000) each occurrence combined single limit of liability for bodily injury, death, and property damage, including owned and non-owned and hired automobile coverages, as applicable; and

 D. Professional liability insurance (Errors and Omissions) with limits not less than two Million Dollars ($2,000,000) annual aggregate for all claims each policy year for computer programming and electronic data processing services.

22.2 Claims Made Coverages. To the extent any insurance coverage required under this Section is purchased on a "claims-made" basis, such insurance shall cover all prior acts of Contractor during the term of this Agreement, and such insurance shall be continuously maintained until at least three (3) years beyond the expiration or termination of the term, or Contractor shall purchase "tail" coverage, effective upon termination of any such policy or upon termination or expiration of the term, to provide coverage for at least one (1) year from the occurrence of either such event.

22.3 Certificates of Insurance. Certificates of Insurance evidencing all coverages described in this Section shall be furnished to hhgregg prior to the Effective Date.

22.4 Cancellation or Lapse Of Insurance. Contractor shall give thirty (30) days prior written notice to hhgregg of cancellation, nonrenewal, or material change in coverage, scope, or amount of any policy. Should Contractor fail to keep in effect at all times the insurance coverages required under this Section 22, hhgregg may, in addition to and cumulative with any other remedies available at law, equity, or hereunder, withhold payments to Contractor required under this Agreement in an amount sufficient to procure the insurance required herein.

**23.** **Information Security and Compliance Addendum.** Contractor shall execute the Information Security Compliance Addendum attached hereto.

**24.** **Entire Agreement; Modification.** This is the sole and complete Agreement of the parties concerning the subject matter hereof and supersedes any prior promises, agreements and understandings between the parties. This Agreement may be amended only by a writing signed by both parties.

IN WITNESS WHEREOF, the parties have executed this Agreement to become effective as of the Effective Date.

89 Degrees, Inc ("Contractor")

By:

Name: Jeffrey CCyk

Title: VP | Partner

Date: 6/15/12

GREGG APPLIANCES, INC..

By:

Name: Jeffrey Pearson

Title: SVP Marketing

Date:

By:

Name: David Southworth

Title: SVP E-Commerce & Digital Services

Date: 6/14/12.

## EXHIBIT A

### Project Description Schedule to Master Independent Contractor Agreement
### Between Gregg Appliances, Inc. and 89 Degrees, Inc. ("Contractor")

This PROJECT DESCRIPTION SCHEDULE ("Schedule"), effective as of April 1, 2012, is an addendum to the Master Independent Contractor Agreement between Gregg Appliances, Inc., with principal offices located at 4151 East 96th Street  Indianapolis, Indiana  46240, its subsidiaries and affiliates (collectively "hhgregg") and 89 Degrees ("Contractor"), with principal offices located at 25 Burlington Mall Road, Suite 610 Burlington, MA  01803

### Term:
The Term of this Project Description Schedule is from 4/1/2012 to 3/31/2013

### Description of Project and Services:

This Project Description Schedule is for Contractor to provide email creative, development, and deployment Services for hhgregg.    The total funding for this Statement of Work shall not exceed $667,825.00.    No additional work shall be undertaken without the express written consent of hhgregg.

The Project Description Schedule document contains the following elements for Contractor to provide email creative, development, and deployment Services for hhgregg.

- Section I: Description of Recurring Services performed throughout the Term of this Project Description Schedule
- Section II: Fee Schedule for Section I Recurring Services
- Section III: Description of project-based Services performed throughout the Term of this Project Description Schedule
- Section IV: Fee Schedule for Section III project-based Services

## SECTION ONE – DESCRIPTION OF RECURRING SERVICES

**I.    Overview.** 89 Degrees will provide the following consulting services for hhgregg's email program: provide email strategy and concepting; manage audience selection and targeting; perform Quality Control for email content; monitor event email and trigger email performance to ensure activity is performing up to expectations; conduct post-deployment analysis of email activity results; provide direction for email program optimization and enhancement; lead new email program initiatives and implement test and learn strategies; update customer database with email send/open/click and site activity data, including links to online & in-store purchases; populating the weekly Tracking Report; manage and update the Customer Segmentation Engine; produce ad hoc analyses of email behaviors and trends   (up to 40 hrs/month); establish user experience workflow and supporting data infrastructure; conduct analysis and develop rules governing personalized email content and receipt prioritization; integrate customer database and Exact Target platforms; review and finalize content and strategies with hhgregg and Exact Target team; concept and design for Sales Event emails

89 Degrees will use the above services to enable the following email streams on the Exact Target platform during hhgregg's FY13:

- Welcome Email stream (using existing template and structure)
- Abandoned shopping cart (static and Dynamic)
- Product  Reviews emails
- Customer Birthday

- Post-purchase, accessories, and cross-sells
- Customer win-back program
- Re-engagement program
- Rewards and wish list emails
- hhgregg.com items browsed retargeting

## II.   Requirements

    **A.**    Full access to hhgregg's Exact Target account
    **B.**    Report and raw data access to hhgregg's Omniture Site Catalyst data
    **C.**    89 Degrees-hosted customer database for hhgregg
    **D.**    Sales feed from hhgregg

## III.   Methodology

    **A.**    Strategic Marketing Services/Project Management – On a daily basis, the Strategic Marketing Services (SMS) and Project Management teams are responsible for the following activities: reviewing existing email programs and providing recommendations for improvement; reviewing client email requests and scheduling resources accordingly; monitoring performance of email activity and reporting to hhgregg; conceiving testing strategies and implementing with client and creative/development teams at 89 Degrees; and reviewing and performing quality control email deliverables.

    **B.**    Database and Analytic Support – On a daily basis, the Database and Analytic teams are responsible for the following activities: maintain data transfer between customer database and email provider platforms; extracting email performance into existing reporting templates; creating, updating and enhancing code that enables dynamic content and personalization within emails; supporting List pull queries for custom emails; and performing ad hoc queries on email data for use in marketing programs.

    **C.**    Creative – On a daily basis, the Creative team is responsible for the following activities: designing assets for hhgregg emails; writing copy for hhgregg emails; making revisions as requested by client and 89 Degrees teams to ensure email meets with hhgregg's needs; and providing recommendations for testing and optimization.

    **D.**    Deployment – On a daily basis, the Deployment team is responsible for the following activities: formatting design elements and coding to fit within email templates; using the Exact Target platform to ensure emails are assigned to correct audiences; managing deployments of tests and final sends; working with Database team to set up and refine triggered emails and associated business rules; and performing quality control on all emails.

**IV.**   **Change Management.** During the execution of these services, circumstances may necessitate changes to the tasks and/or time estimates included in the scope of this project. If this occurs, 89 Degrees and Customer will in good faith discuss these changes at their earliest opportunity. Customer will not be billed or accrue any additional charges for services fees not set forth in this SOW unless otherwise agreed to in writing as evidenced by a signed 89 Degrees Supplemental Scope of Work form.

**V.**   **89 Degrees Team.** The 89 Degrees team consists of an Account group with overall responsibility for project success, a Project Manager for managing day-to-day operations for the email program, Database and Analytics Managers for maintaining email data and providing reports and insights, Creative designers for executing email templates and supporting imagery, Developers for coding HTML email files and providing back-end integration work, and Deployment Specialists responsible for setting up and sending emails using the Exact Target platform.

**VI.**   **Deliverables.** In addition to providing the services outlined in the Overview, 89 Degrees shall provide Customer with the following deliverables:

    **A.**    Project Schedule for each email stream
    **B.**    Weekly reporting via the Marketing Channels Tracking Report
    **C.**    Creative design and technical implementation for identified email streams

**VII.   Duration.** Project timelines will vary based on each specific component being executed. Durations provided with project schedules are estimates only and are based upon Customer availability, Customer's third party resources, delivery of data or content and timely acceptance of the schedules and all other deliverables presented by 89 Degrees.

**VIII.  Customer Responsibilities**

    **A.** Participation during data and workflow strategy

    **B.** Participation during design reviews

    **C.** Adherence to timelines set forth in Project Schedules created by 89 Degrees

    **D.** Allowing 4-6 hours for basic revisions/updates to existing emails; 1.5    3 business days for development of emails based on existing templates from point of assets being provided; 3-4 business days for ad hoc email design based on existing assets; complex revisions to email imagery and design; build of accompanying landing pages

**IX.  Exclusions.** The following activities are not included in this SOW and require an additional services engagement:

    **A.** Newly created Welcome email stream touches or re-design based on new template

    **B.** Service support outside of standard business hours (8:30 AM - 5:30 PM Mon-Fri) except as mutually approved on a case by case basis by 89 Degrees and hhgregg.

## SECTION TWO – FEE SCHEDULE FOR SECTION I RECURRING SERVICES

Note all hours billed at $125/hour

| | SMS | | | | Analytics | | | Database |
|---|---|---|---|---|---|---|---|---|
| | Gordon | Myers | Heroux | Caplan | Brady | Tagupa | Maynard | Yang P |
| SMS/Project Mgt | 115.2 | 10 | 50 | 5 | | | | |
| MIC database & analytic support | | 5 | 17 | 5 | 25 | 30 | 10 | 5 |

| | Creative/Deployment | | |
|---|---|---|---|
| | Napier | Pillai | Sawyer |
| Event Creative | 25 | 5 | 45 |

| | Total Hours | Monthly Cost | FY13 Total |
|---|---|---|---|
| SMS/Project Mgt | 178 | $22,213 | $266,500 |
| MIC database & analytic support | 102 | $12,750 | $153,000 |
| Event Creative | 105 | $13,125 | $157,500 |
| **Totals** | 385 | $48,088 | $577,050 |

## SECTION III: DESCRIPTION OF PROJECT-BASED SERVICES

**I.    Overview.** 89 Degrees will enhance the hhgregg email program by providing consulting, design, development and deployment services in support of the following projects:

- Email Preference Center, including Rewards program (Phase II),
- Triggered Email Optimization Engine (Phase I)
- hhgregg Customer Database (MIC)/ExactTarget Platform Integration
- SilverPop Email Deployments

Details for what is included in each project can be found in the Methodology section below.

## II.   Requirements

A.   Full access to hhgregg's Exact Target account
B.   89 Degrees-hosted customer database for hhgregg
D.   Sales feed from hhgregg

## III.   Methodology

A.   Email Preference Center – 89 Degrees will provide design and development services to create an email profile management page and supporting Web services that opted in consumers can use to update their contact information and provide additional detail about their interests to hhgregg; this information will then be used to personalize email content for increased relevancy. The preference center will be accessible via links included in hhgregg emails and upon initial sign-up for hhgregg emails. As part of this project, 89 Degrees will provide recommendations for testing methods that provide the highest completion rate of the Preference Center data fields and will provide design and development service designed to support one round of testing.
B.   Triggered Email Optimization Engine (Phase I) – 89 Degrees will provide database, analytics and development services to determine a series of business rules that automate and prioritize the delivery of multiple emails that an opted in consumer may qualify for and the content which should go into those emails. In consultation with the hhgregg team to determine business priorities, 89 Degrees will create a list of conditions that the email program will account for and then implement these programmatically so that triggered deployment is driven by these rules. Rules are designed to accommodate emails covered in Phase 1 and Phase 2 of the hhgregg email plan for FY13 and will be monitored to ensure optimal performance. New triggered email streams added after Phase 2 will require separately scoped revisions to the Optimization Engine.
C.   hhgregg Customer Database (MIC)/ExactTarget Platform Integration – 89 Degrees will provide database and development services designed to enable data sharing and requisite workflows between the hhgregg Customer Database (also known as Marketing Intelligence Center, or MIC) and the ExactTarget platform. This integration will be necessary to ensure proper opt-in status, preference information, and establishing qualifications for triggered email streams are maintained and shared between the two systems and remain in synch.
D.   SilverPop Email Deployments – Until hhgregg's email deployments have transitioned over to the ExactTarget platform, 89 Degrees will continue to provide email deployment services to hhgregg through SilverPop. These deployments will be billed at a CPM of $1.50 and should not exceed a total of $17,025 in billings based on the schedule of when emails will have transitioned to ExactTarget.

IV.   **Change Management**. During the execution of these services, circumstances may necessitate changes to the tasks and/or time estimates included in the scope of this project. If this occurs, 89 Degrees and Customer will in good faith discuss these changes at their earliest opportunity. Customer will not be billed or accrue any additional charges for services fees not set forth in this SOW unless otherwise agreed to in writing as evidenced by a signed 89 Degrees Supplemental Scope of Work form.

V.   **89 Degrees Team.** The 89 Degrees team consists of an Account group with overall responsibility for project success, a Project Manager for managing day-to-day operations for email-related projects, Database and Analytics Managers for maintaining email and customer data infrastructure, Creative designers for executing associated design, and Developers for front-end coding and providing back-end integration work.

**VI.  Deliverables.** In addition to providing the services and assets outlined in the Overview and Methodology sections, 89 Degrees shall provide Customer with the following deliverables:

    **A.**  Project Schedule for each deliverable
- Email Preference Center; expected completion date: June 2012
- Triggered Email Optimization Engine (Phase 1); expected completion date: October 2012
- hhgregg Customer Database (MIC)/ExactTarget Platform Integration; expected completion date: June 2012
- SilverPop Email Deployments; expected completion date: July-August, 2012

    **B.**  Creative design and technical implementation for identified email streams

**VII.  Duration.** Project timelines will vary based on each specific component being executed. Durations provided with project schedules are estimates only and are based upon Customer availability, Customer's third party resources, delivery of data or content and timely acceptance of the schedules and all other deliverables presented by 89 Degrees.

**X.  Customer Responsibilities**

    **A.**  Participation during data and workflow strategy
    **B.**  Participation during design reviews
    **C.**  Adherence to timelines set forth in Project Schedules created by 89 Degrees

**XI.  Exclusions.** The following activities are not included in this SOW and require an additional services engagement:

    **A.**  Updates to Triggered Email Optimization Engine once browse-based retargeting emails are implemented.
    **B.**  Execution of test and learn initiatives associated with the Preference Center beyond what is accounted for in the Methodology section.
    **C.**  Additional integration between MIC and ExactTarget necessitated by future changes in client email strategy or changes in the ExactTarget platform.

**SECTION IV: FEE SCHEDULE FOR PROJECT-BASED SERVICES**

|  | SMS | | | Analytics | Database | |
|---|---|---|---|---|---|---|
|  | Gordon | Heroux | Caplan | Tagupa | Yang | Song |
| Preference Center | 10 | 10 |  |  | 5 |  |
| Trigger Optimization Engine Phase 1 | 10 | 15 | 10 | 60 |  |  |
| MIC/ET Integration | 10 |  |  | 25 | 30 | 20 |

|  | Development | | | | Creative/Deployment | | |
|---|---|---|---|---|---|---|---|
|  | Repik | Sheehan | Pond | Pounanov | Napier | Pillai | Sawyer |
| Preference Center | 30 | 25 |  | 20 | 40 | 10 | 5 |
| Trigger Optimization Engine Phase 1 | 15 |  | 10 | 15 |  |  |  |
| MIC/ET Integration |  |  |  | 50 |  |  |  |
| Phase 1 Template Design |  |  |  | 20 | 70 | 10 | 20 |

|  | Total Hours | FY13 Total |
|---|---|---|
| Preference Center | 165 | $20,625 |
| Trigger Optimization Engine Phase 1 | 135 | $16,875 |
| MIC/ET Integration | 150 | $18,750 |

| Phase 1 Template Design | 140 | $17,500 |
|---|---|---|
| Silverpop Deployment (~11.35M emails) | $1.50 CPM | $17,025 |
| | Total | $90,775 |

**Invoicing and Payment Terms:** One correctly written invoice will be submitted to hhgregg each month for the amount of $48,088.00 for recurring services and agreed upon fees for project-based services or deployment as required, with approved timesheets and expense documentation by week once per month for each month for the duration of this Scope of Work. Correctly written and undisputed invoice amounts will be paid thirty (30) days from receipt of such correctly written invoice. 89 Degrees and hhgregg will monitor hours associated with email deployment on an ongoing basis. If actual hours exceed or fall below projected scope, 89D and hhgregg will review and revise as needed.

**Meetings:** hhgregg and Contractor will hold weekly meetings to monitor the quality of deliverables produced, and any other project matters. These meetings will be attended by representatives from both hhgregg and Contractor including the Contractor account team. Any concerns regarding the quality of deliverables will be escalated to the Contractor Account Executive team. Final payment will be released upon hhgregg's acceptance of the deliverables noted above.

If for any reason this Statement of Work is terminated, hhgregg shall be responsible only for actual hours worked or projects completed.

89 DEGREES, INC. ("Contractor")

Name:

Title: VP Partner

Date:

HHGREGG GREGG APPLIANCES, INC..

Name: Jeffrey Pearson

Title: SVP Marketing

Date: 6/14/2012

By:

Name: David Southworth

Title: SVP E-Commerce & Digital Services

Date: 6/14/12

**EXHIBIT B**

**Project Description Schedule to Master Independent Contractor Agreement
Between Gregg Appliances, Inc. and 89 Degrees, Inc. ("Contractor")**

This PROJECT DESCRIPTION SCHEDULE ("Schedule"), effective as of April 1, 2012, is an addendum to the Master Independent Contractor Agreement between Gregg Appliances, Inc., with principal offices located at 4151 East 96th Street Indianapolis, Indiana 46240, its subsidiaries and affiliates (collectively "hhgregg") and 89 Degrees ("Contractor"), with principal offices located at 25 Burlington Mall Road, Suite 610 Burlington, MA 01803

**Term:**
The Term of this Project Description Schedule is from 4/1/2012 to 3/31/2013

**Description of Project and Services:**

The document contains the following sections:

- Section One – overview of key areas of responsibility
- Section Two – investment and key activities associated with each category of investment
- Section Three – summary of scheduled and on demand reporting

It is our intent in providing this level of detail to show clearly the resources and activities we are deploying in support of hhgregg's marketing and corporate objectives.

**SECTION ONE – OVERVIEW OF KEY AREAS OF RESPONSIBILITY**

**Marketing Database**

- Host hhgregg database
    - Maintain data in secure environment
        - Security document attached with documentation of most recent audits and procedures
    - Share information on security audits and security issues with hhgregg within a maximum of 24 hours of our notification
- Maintain current software licenses reasonably necessary to conduct hhgregg business
    - ETL, Householding, Analytics, Etc.
- Manage customer and prospect data updates
    - Update customer records daily with written and delivered sales details, email, direct mail and mobile contacts and responses
    - Update activity associated with hhgregg.com site, including detailed click stream data (pages visited, products viewed, time on site, etc.)
        - Activity associated with known customers will be linked to these customers for marketing and analytic purposes (supported with monthly reports)
        - Activity associated with unknown customers/prospects will be captured and maintained on basis of cookies. If cookie is subsequently matched to customer, captured historic activity associated with that cookie will be linked to the customer (supported with monthly reports)

**Strategy**

- Provide ongoing consulting and recommendations on direct and digital marketing strategy and programs
- Supply quarterly industry best practice summaries, including implications/opportunities for hhgregg
- Support broader marketing initiatives (e.g., newspaper ZIP Code reporting and priority placement models) and enterprise decision making (e.g., site potential) as needed
- Provide alternatives, recommendations and best practices for loyalty/rewards initiative
  - Ongoing through program launch, quarterly thereafter

**Direct Mail**

- Oversee all aspects of direct mail in support of events, GOs, rewards, and other ad hoc programs
- Manage audience selection, including the development of models to select customers and prospects most likely to respond
- Utilize Route Remix to assure right combination of low postage and maximum response
- Complete regular NCOA and other processes needed for USPS compliance and efficient processing
- Track and provide timely reporting on mail delivery, including oversight of print vendor and coordination with USPS to help ensure 100% delivery through event end date
  - Tracking will begin at least three days prior to first in-home date and continue until at least two days from event end date
  - Tracking will cover details of delivery by State; more granular tracking (down to local post office) will be available for any areas not on expected delivery timeline
- Coordinate all production activities, including file, creative and production schedules
- Propose and execute tests (format, offer, creative, etc.) to stimulate response
- Provide event snapshot reports and quarterly evaluations of DM metrics and observations/ recommendations
  - Event snapshots will be produced within 7 days of event window end
  - Quarterly evaluations will occur within first 15 days following quarter end

**Analytics**

- Produce scheduled and ad hoc reports/analyses, as is outlined in Section Three

**Social**

- Propose and execute campaigns designed to acquire Likers and increase engagement (includes daily posts [1-3 per day] and "mini" campaigns [1-2 per month])
  - Objective of 300K Likers by end of FY
- By FQ3, direct and implement commerce presence (which includes on-site sales as well as activities to support .com and in-store sales) through dedicated tabs, posts, offers and mini-campaigns
- Coordinate with hhgregg Promotions personnel on the implementation of up to 5 campaigns featuring vendor supported merchandise giveaways and/or charity activities
  - Supporting assets to include dedicated campaign page with form and Thank You page, plus supporting FB ad assets
- Assist in reputation management activities (including comment monitoring, customer issue response and coordination with hhgregg customer care) – approx. 16 hours/week
- Establish and maintain presence on Google+ in order to assist SEO activities
  - Presence to be simplified version of content found in FB (posts, photos, videos)
- Strategic recommendations for additional social opportunities to be funded on project-by-project basis (i.e. Pinterest, YouTube, Twitter)

- o Recommendations are covered by Social retainer; assistance to execute against the recommendations will be billed at hourly rate of $125/hr
- o Note: FY13 Social scope will continue to include adapting Facebook posts for Twitter environment. However, any plans to increase usage of Twitter as venue for customer communications (either through offers or as a dedicated support channel) will necessitate a separately funded project scope, the breadth of which will be dependent upon hhgregg's involvement/assistance.
- 89 Degrees expects to be provided $115,000 in FY13 for Social Display ads
  - o Ads will be placed without mark up

## Creative

- Provide creative support/assets for the following:
  - o Assistance with Event Direct Mail and pre-print, including the creation of 2-3 concepts for lock-ups for each event and input/direction on print layouts and execution
  - o Recommendations and layouts for new print opportunities (e.g., Manufacturer Program, Water Filter program)
  - o Creation of website assets in support of events and promotions, including banners and landing pages

    Note: Up to 40 hours/month are covered by the Creative Retainer; activity required beyond these hours will be quoted and approved separately.

## Mobile

- Support mobile campaigns
  - o Fees for mobile will be billed based on actual usage, with a monthly minimum of $2750; this minimum includes:
    - ▪ Shortcode leasing, hosting and connectivity
    - ▪ Mobile database and reporting
    - ▪ 5000 Outgoing and 5000 Incoming messages
  - o Additional messages will be billed at $.03/message for Outgoing and $.02/message for Incoming.

## SECTION TWO – SUMMARY OF INVESTMENT AND ACTIVITIES COVERED BY INVESTMENT CATEGORY

| Category | Rate | Frequency | FY13 Total | Activities | Notes |
|---|---|---|---|---|---|
| DM CPM | $17.50 | 60,000,000 | $1,050,000 | Database Maintenance | Daily Updates to Data Foundation Module |
| | | | | Model Development | Customer/Prospect/DMA/Category/Etc. |
| | | | | Event Recommendation | Offer/Creative/Format/Audience/Pro Forma |
| | | | | Event/GO Audience Recommendation | Scenarios with C/P Mix, Store Allocation, Expense |
| | | | | Event/GO DM Mail File Prep | |
| | | | | Event/GO DM Analyses | Event One Pager & Quarterly Deep Dives |
| | | | | DM Creative Support | HHG Review & Recommendations (not full blown) |
| | | | | Hardware/Software Expense | |
| | | | | NCOA Expense | |
| | | | | Travel Expense | |
| | | | | SMS - Caplan (50%) | |
| | | | | SMS - Heroux (50%) | Other 50% on email/digital |
| Analytic Retainer | $20,000 | 12x/year | $240,000 | Scheduled Reporting | See Reporting Appendix |
| | | | | ad hoc analyses | ~ 60 hours/month for On Demand & ad hoc analysis |
| Social Retainer | $12,500 | 12x/year | $150,000 | Reputation Management | Support HHG efforts to log & respond to complaints |
| | | | | Engagement | Posts and campaigns designed to drive interaction |
| | | | | Program Development | Social campaign recommendations and execution |
| | | | | Social Creative Support | Post, wall, campaign, and social ad assets |
| SMS Retainer | $7,000 | 12x/year | $84,000 | SMS - Myers (40%) | Myers assigned full time to HHG; remainder of time covered by email and DM CPM |
| Creative Retainer | $5,000 | 12x/year | $60,000 | hi res assets for DM & Pre-print | 2-3 concepts for approx. 50 event promotions |
| | | | | ad hoc Support | Website assets, DM layouts, Promotions support |
| Mobile | $5,000 | 12x/year | $60,000 | Mobile Development & Execution | Billed on basis of usage (min. of $2,750) |
| Total | | | $1,644,000 | | |

**SECTION THREE -- REPORTING SCHEDULE**

| Category | Report | Timing |
|---|---|---|
| Direct Mail | One-page Recap | 7 Days after 14 day event window ends |
| | Deep Dive | Quarterly - 15th business day of quarter end |
| | Competitor Review | Quarterly - 15th business day of quarter end |
| Social | Snapshot | Weekly - Wednesday by 2PM |
| | Recap | Monthly - 10th business day of month |
| | Competitor Review | Monthly - 10th business day of month |
| | Deep Dive | Quarterly - 15th business day of quarter end |
| Other | Ad On/Off | Weekly - Tuesday AM |
| | Newspaper | Bi-Weekly - by Thursday PM |
| | Customer Health | Monthly - 10th business day of month |
| | HH Share | Monthly - 10th business day of month |
| | Traffic | Monthly - 10th business day of month |
| | Creative Assets | Monthly - 10th business day of month |
| | .com Click Stream Activity | Monthly - 10th business day of month |
| | QBR Summary & Opportunitites | Quarterly - 15th business day of quarter end |
| | Customer Profile | On Demand |
| | Site Selection | On Demand |
| | Credit Card | On Demand |

Gregg Appliances, Inc.

Signature: _Hadshun_

Name: _JEFF PEARSON_

Title: _SVP MARKETING_

Signature: _6/14/2012_
Date
JoP

Contractor

Signature: _NWCCh_

Name: _Jefon NCCark_

Title: _V. Partner_

Date: _6/15/12_

## INFORMATION SECURITY COMPLIANCE ADDENDUM

This Addendum is entered into as of April 1, 2012 (the "Effective Date") by and between Gregg Appliances, Inc. ("hhgregg") and 89 Degrees, Inc. ("Contractor") and supplements the MASTER INDEPENDENT CONTRACTOR AGREEMENT entered into by hhgregg and Contractor on or about May 3rd, 2012 (the "Agreement"). The Agreement, as supplemented hereby, shall remain in full force and effect in accordance with its terms and is hereby ratified and affirmed. To the extent there are any conflicts between the terms of this Addendum and the terms of the Agreement, the terms of this Addendum shall control.

      1.    **Purpose of this Addendum**.  Pursuant to the Agreement, Contractor may have access to personally identifiable information provided by hhgregg, as well as personally identifiable information that may be compiled or generated through hhgregg's use of Contractor's services (collectively "PII").  This Addendum outlines Contractor's obligations related to the protection of the PII to ensure that such PII is not compromised or inadvertently disclosed.

      2.    **Ownership of PII**.  Contractor recognizes that title to and ownership thereof, the PII shall remain with hhgregg.  To the extent that Contractor acquires any right, title and interest in and to the PII, Contractor hereby assigns to hhgregg, all right, title and interest in and to all PII.

      3.    **Obligation to Protect PII**.  At all times, Contractor shall use commercially reasonable efforts to protect the PII against unauthorized use, disclosure, modification or loss.  In that regard Contractor shall:

      a.    Maintain the PII with at least the same degree of care that Contractor uses to protect its own confidential information of a similar nature, but no less than a reasonable degree of care under the circumstances;

      b.    Refrain from using the PII except as necessary to provide the services that it has been employed to provide under the Agreement;

      c.    Refrain from disclosing or providing any PII to any third party without the prior written consent of hhgregg, provided however, that Contractor may disclose the PII to its employees or contractors to the extent necessary for Contractor to perform the services to hhgregg, so long as such employees and contractors are advised of the confidential and proprietary nature of the PII and are obligated to keep such PII confidential;

      d.    Ensure that its directors, officers, employees, subcontractors or agents use the PII solely for the purpose of performing the services for hhgregg; and

      e.    Take reasonable and appropriate steps consistent with current technological developments generally in use in Contractor's industry to ensure that all PII is secure.  The steps that Contractor will be required to take will be commensurate with the type and sensitivity of PII maintained by Contractor.  Such steps for the relevant systems and processes that are involved with the provision of services to hhgregg may include:

      i.    using encryption technology for transmission of all PII;

      ii.    maintaining PII behind a firewall;

      iii.    keeping all firewall software and hardware current;

      iv.    periodically testing the vulnerability of Contractor's relevant systems

      v.    keeping systems up to date with security patches;

vi.   employing (and regularly updating) anti-virus software on all relevant systems;

vii.   password protecting access to PII;

viii.   only using secure methods of file and data transfer; and

ix.   employing proper monitoring and alerting processes to ensure that possible security violations are quickly identified.

4.   **Obligations in the Event of Security Breach.** In the event of a data security breach involving PII that is maintained by Contractor, Contractor shall immediately notify hhgregg upon Contractor becoming aware of the breach and shall take such other steps reasonably requested by hhgregg or required by law to notify any individual whose PII was breached (i.e., obtained or accessed by an unauthorized third party). Contractor shall indemnify hhgregg against any costs (including attorneys' fees) that hhgregg incurs as the result of such a security breach, including any costs related to notifying all individuals whose PII was subject to the security breach. In addition, Contractor shall indemnify Customer against any costs (including attorneys' fees) that Customer incurs as the result of such a security breach, including any costs related to notifying customers of the security breach.

5.   **Audit.** hhgregg may verify Contractor's compliance with this Addendum by reasonably inspecting the records and systems of Contractor at Contractor's facilities, during Contractor's normal business hours, once per twelve (12) month period (or more frequently, if hhgregg has a good faith belief Contractor is violating the terms of this Addendum), provided that hhgregg provides five (5) business days advance written notice of such audit. If the inspection reveals that Contractor is not in compliance with this Addendum and Contractor fails to cure such non-compliance within the applicable cure period set forth in the Agreement, hhgregg may terminate the Agreement in accordance with its terms and may pursue all available remedies for a material breach of the Agreement and reimbursement for the costs of conducting such audit subject to the terms and conditions of the Agreement.

6.   **Insurance.** During the term of the Agreement, Contractor shall maintain in full force and effect an insurance policy or policies covering cyber liability with an appropriate coverage limits sufficient to cover any and all costs that could potentially arise in the event of a security breach. Copies of certificates of insurance, together with copies of all policies and policy amendments and endorsements, shall be provided to hhgregg upon its request.

7.   **Termination.** Upon termination of the Agreement, any executed Project Description Schedule(s), Attachment(s), Exhibit(s), and/or Amendment(s) for any cause or for no cause, or at any earlier time upon the demand of hhgregg, Contractor shall, without cost to hhgregg: (a) deliver to hhgregg in an orderly and expeditious manner all PII belonging to hhgregg then in the possession of Contractor, including all copies, extracts, summaries, and portions thereof, on whatever media rendered; (b) purge from its computer systems all PII and all copies, extracts, summaries, and portions thereof; and (c) upon request of hhgregg, certify in writing that it has complied with these requirements. The obligations of Contractor under this Addendum with respect to the use and secrecy of the PII shall remain in full force and effect for as long as the PII remains secret and confidential and is not publicly available or publicly disclosed by hhgregg.

IN WITNESS WHEREOF, the parties acknowledge that they have read, understand, and agree to the terms and conditions of this Addendum.

Gregg Appliances, Inc.

Signature: _____

Name: Dave Satherdorth

Title: SVP Digital Services

~~Signature:~~ 6/14/2012

~~Date:~~

Contractor

Signature: _____

Name: _____

Title: VP | Partner

Date: 6/13/12





TO:      Chris Sutton and Rob Brown
FR:      Jeff Caplan
DA:      November 16, 2016

RE:      Proposed Scope of Work

**Overview**

Thank you again for the opportunity to partner with hhgregg. We greatly appreciate our long-standing relationship and the prospect of continuing to work with you moving forward.

This document contains descriptions of proposed services related to:
- Data hosting and software
- SAS Visual Analytics hosting
- Analytic support
- Strategic and operational support

More details on each service follows. These description are followed by an investment summary that shows monthly fees for hosting, software and analytic/strategic support.

Data Hosting and Software

89 Degrees will maintain a marketing database containing customer and transaction history, as well as select detail on customer interactions (e.g., email response), partner media data (e.g., display advertising placement and spend), and appended data (e.g., Nielsen PRIZM). The database will be updated at agreed upon intervals (real-time, daily, monthly, etc.) with data from HHG and its approved partners. A current data schema showing the database structure and data sources/timing is attached.

89 Degrees will make changes to the database and the source data it receives and sends to other hhgregg partners as necessary and as agreed to in writing by HHG. The timing and any expense associated with a change will be documented and approved in writing by HHG prior to the commencement of the change. 89 Degrees will use a change order request for this purpose.

89 Degrees will utilize a pool of data services resources for purposes of database maintenance.

SAS Visual Analytics Hosting

89 Degrees will maintain an instance of SAS Visual Analytics (SAS VA) that can be accessed by 89D and HHG employees, and by other partners as agreed to by HHG. 89D will develop and modify reports and dashboards in conjunction with HHG, and will ensure all of the information in the reports and dashboards is updated at the agreed upon schedule.

89D will host up to four terabytes of data. 89D will notify HHG if this limit is approached, at which point HHG will have the option of purging older data or investing in more storage and/or faster servers to ensure VA operates in an efficient manner.

 

<u>Analytic Support</u>

89 Degrees will supply the following analytic resources throughout the term of this SOW:

| Title | Allocation | Responsibilities |
|---|---|---|
| Senior Director | 75% | • Analytic team oversight & management<br>• VA SME<br>• Mail file modeling and analysis oversight |
| Senior Manager | 100% | • VA report creation & update<br>• Ad hoc analyses |
| Senior Manager | 50% | • New Mover and Email reporting<br>• Ad hoc analyses |

89D will coordinate closely with HHG on analytic projects and associated timelines. This coordination will include the periodic development of analytic roadmaps, which 89D and HHG will use to review and set overall priorities. 89D will hold weekly status update meetings during which time the active project list will be reviewed and prioritized to best meet HHG requirements.

<u>Strategy and Operations</u>

89 Degrees will supply the following strategy and operations resources throughout the term of this SOW:

| Title | Allocation | Responsibilities |
|---|---|---|
| VP/Partner - SMS | 10% | • Team management and oversight<br>• Analytic and marketing strategy recommendations/insights<br>• Issue resolution/point of escalation |
| Account Manager - SMS | 50% | • Use of analytic output and data for business purposes (programs relying on segmentation results, Customer Journey Management, etc.)<br>• Data processing (ensure data to/fr 89D is timely and sent &/or received on schedule)<br>• Budget management<br>• Internal meeting and process management |

Please note that 89D has upgraded the Program Manager position to an Account Manager role. This individual will perform account and program management functions as described above and will be billed at the Program Manager rate (i.e., no change in rate/retainer amount).





**Investment**

The investment for 89D services consists of data hosting, software licenses, and a retainer for the services described above. In addition to these services, 89D will manage the New Mover program, including billing the New Mover partners and consolidating their charges (outside of postage invoices, which HHG will continue to pay directly) into a single monthly invoice. 89D will manage this program at cost (i.e., no markup).

| 89D Fees | Apr | May | Jun | Jul | Aug | Sep-16 | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 | Mar-17 | FY17 (Sep - Mar) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Analytic Retainer | | | | | | $33,750 | $47,000 | $47,000 | $47,000 | $47,000 | $47,000 | $47,000 | $315,750 |
| SMS & PM Retainer | | | | | | | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $54,000 |
| Data Services Retainer | | | | | | $26,100 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $146,100 |
| Data Hosting and Software | | | | | | | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $45,000 |
| Total | | | | | | $59,850 | $83,500 | $83,500 | $83,500 | $83,500 | $83,500 | $83,500 | $560,850 |

| 89D Fees | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | FY18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Analytic Retainer | $47,000 | $47,000 | $47,000 | $47,000 | $47,000 | $47,000 | $47,000 | $47,000 | $47,000 | $47,000 | $47,000 | $47,000 | $564,000 |
| SMS & PM Retainer | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $108,000 |
| Data Services Retainer | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $240,000 |
| Data Hosting and Software | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $90,000 |
| Total | $83,500 | $83,500 | $83,500 | $83,500 | $83,500 | $83,500 | $83,500 | $83,500 | $83,500 | $83,500 | $83,500 | $83,500 | $1,002,000 |

**Terms of Service**

- Scope of Service and investment levels are valid until March 31, 2018, at which point they can be continued, re-negotiated, or cancelled
  - 90 Days written notice for cancellation
- HHG and 89D both have right to opt out at convenience or for any reason with 90 days written notice, and HHG has right to opt out at 30 days for uncured breach of service
- Payment for retainers are invoiced at beginning of month and are net 30 days
- Payment for New Mover will be billed at end of month (following delivery of the DM/EM) and are net 30 days

**Approvals**

For:        hhgregg                                    89 Degrees

Name        _____          _____

Signature   _____          _____

Title       _____          _____

Date        _____          _____

# EXHIBIT B

Invoices for amounts due under the Contract from 89 Degrees to the Debtor



# Invoice

| | |
|---|---|
| **Date** | 11/1/2016 |
| **Invoice #** | 16-1231 |
| **Terms** | Net 30 |

Burlington, MA 01803
25 Burlington Mall Road
Suite 610
Burlington, MA   01803

Address for Payments:
PO Box 392316
Pittsburgh, PA  15251-9316

**Bill To**

hhgregg
4151 E. 96th Street
Indianapolis, IN 46240

| | |
|---|---|
| **Project** | November New Mover |
| **Job Name** | |
| **P.O. No.** | Nov. New Mover Passthroug |

| Description | Amount |
|---|---|
| DM 2: New Mover Passthrough | 33,157.75 |

| | |
|---|---|
| **Total** | $33,157.75 |



# Invoice

| | |
|---|---|
| **Date** | 12/1/2016 |
| **Invoice #** | 16-1301 |
| **Terms** | Net 30 |
| **Due Date** | 12/31/2016 |

**89 Degrees**
Burlington, MA 01803
25 Burlington Mall Road
Suite 610
Burlington, MA    01803

Payment Address
PO Box 392316
Pittsburgh, PA  15251-9316

**Bill To**

hhgregg
4151 E. 96th Street
Indianapolis, IN 46240

| **Project** | December New Mover |
|---|---|
| **Job Name** | |
| **P.O. No.** | December New Mover |

| Description | Amount |
|---|---|
| DM 2: New Mover | 79,118.17 |

| | **Total** | **$79,118.17** |
|---|---|---|



# Invoice

| | |
|---|---|
| **Date** | 12/31/2016 |
| **Invoice #** | 16-1362 |
| **Terms** | Net 30 |
| **Due Date** | 1/30/2017 |

**89 Degrees**
Burlington, MA 01803
25 Burlington Mall Road
Suite 610
Burlington, MA   01803

Payment Address
PO Box 392316
Pittsburgh, PA  15251-9316

**Bill To**

hhgregg
4151 E. 96th Street
Indianapolis, IN 46240

| | |
|---|---|
| **Project** | December New Mover |
| **Job Name** | |
| **P.O. No.** | December New Mover |

| Description | Amount |
|---|---|
| DM 2: New Mover | 44,609.39 |

| | |
|---|---|
| **Total** | $44,609.39 |



89 Degrees
Submit Payments to:
PO Box 392316
Pittsburgh, PA 15251-9316

**HHGregg**
**4151 E. 96th Street**
**Indianapolis, IN 46240**
**Attention: Rob Brown**

INVOICE INV00000

| INVOICE DATE | PLEASE PAY | DUE DATE |
|---|---|---|
| 1/31/2017 | $39,475.15 | 3/2/2017 |

Payment Terms: Net 30
Tax Payer ID 45-2157128

| | NET AMOUNT |
|---|---|
| **Total** | $39,475.15 |

Monetary values are in USD



89 Degrees
Submit Payments to:
PO Box 392316
Pittsburgh, PA 15251-9316

# INVOICE INV00146

**HHGregg**
**4151 E. 96th Street**
**Indianapolis, IN 46240**
**Attention: Rob Brown**

| INVOICE DATE | PLEASE PAY | DUE DATE |
|---|---|---|
| 3/13/2017 | **$13,606.14** | 4/12/2017 |

Payment Terms: Net 30
Tax Payer ID 45-2157128

HHG New Mover

| Description | NET AMOUNT |
|---|---|

| Total | $13,606.14 |
|---|---|

Monetary values are in USD



89 Degrees
Submit Payments to:
PO Box 392316
Pittsburgh, PA 15251-9316

## INVOICE INV00182

**HHGregg**
**4151 E. 96th Street**
**Indianapolis, IN 46240**
**Attention: Rob Brown**

| INVOICE DATE | PLEASE PAY | DUE DATE |
|---|---|---|
| 3/13/2017 | $2,296.53 | 4/12/2017 |

Payment Terms: Net 30
Tax Payer ID 45-2157128

HHG New Mover

| Description | NET AMOUNT |
|---|---|
| RD Drop 31 mailed 2/22- Quad | |

| Total | $2,296.53 |
|---|---|

Monetary values are in USD


89DEGREES

# Invoice

| | |
|---|---|
| **Date** | 12/1/2016 |
| **Invoice #** | 16-1262 |
| **Terms** | Net 30 |
| **Due Date** | 12/31/2016 |

**89 Degrees**
Burlington, MA 01803
25 Burlington Mall Road
Suite 610
Burlington, MA   01803

Payment Address
PO Box 392316
Pittsburgh, PA  15251-9316

**Bill To**

hhgregg
4151 E. 96th Street
Indianapolis, IN 46240

| | |
|---|---|
| **Project** | FY17 Retainer |
| **Job Name** | Dec 2016 Retainers |
| **P.O. No.** | Retainers |

| Description | Amount |
|---|---|
| DM4: Analytic, SMS, OPS Retainer | 56,000.00 |
| DM4: Database Retainer | 27,500.00 |

| **Total** | $83,500.00 |
|---|---|



89 Degrees
Submit Payments to:
PO Box 392316
Pittsburgh, PA 15251-9316

## INVOICE INV00011

**HHGregg**
**4151 E. 96th Street**
**Indianapolis, IN 46240**
**Attention: Rob Brown**

| INVOICE DATE | PLEASE PAY | DUE DATE |
|---|---|---|
| 1/1/2017 | **$83,500.00** | 1/31/2017 |

Payment Terms: Net 30
PO Number: FY17 Retainer
Tax Payer ID 45-2157128

FY17 Retainer 01-Jan-2017 through 31-Jan-2017

| Description | NET AMOUNT |
|---|---|
| **Services** | |
| HHG-160001: Monthly Invoice -- January | $83,500.00 |
| Analytics, Database Hosting, Project Management and Strategic Marketing Services Support | |
| Analytics/SMS/OPS - $56,000 | |
| Database Services - $27,500 | |
| **Total** | **$83,500.00** |

Monetary values are in USD



89 Degrees
Submit Payments to:
PO Box 392316
Pittsburgh, PA 15251-9316

## INVOICE INV00052

**HHGregg**
**4151 E. 96th Street**
**Indianapolis, IN 46240**
**Attention: Rob Brown**

| INVOICE DATE | PLEASE PAY | DUE DATE |
|---|---|---|
| 2/1/2017 | $83,500.00 | 3/3/2017 |

Payment Terms: Net 30
Tax Payer ID 45-2157128

2016 HHG Monthly Retainer

| Description | NET AMOUNT |
|---|---|
| **Services** | |
| HHG-160001: Feb Invoice | $83,500.00 |

| Total | $83,500.00 |
|---|---|

Monetary values are in USD



|  | 89 Degrees |
|---|---|
|  | Submit Payments to: |
|  | PO Box 392316 |
|  | Pittsburgh, PA 15251-9316 |

## INVOICE INV00104

**HHGregg**
**4151 E. 96th Street**
**Indianapolis, IN 46240**
**Attention: Rob Brown**

| INVOICE DATE | PLEASE PAY | DUE DATE |
|---|---|---|
| 3/1/2017 | $84,633.97 | 3/31/2017 |

Payment Terms: Net 30
Tax Payer ID 45-2157128

2016 HHG Monthly Retainer

| Description | NET AMOUNT |
|---|---|
| **Services** | |
| HHG-160001: Mar Retainer Invoice | $83,500.00 |

| Total | $84,633.97 |
|---|---|

Monetary values are in USD

Partially Paid
Paid: $68,253.20
Not Paid: $16,380.77

Invoice - INV00104          Email Questions: accountingsupport@89degrees.com          Page 1 of 2
                            Phone: 781-221-5400