IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: <br><br> hhgregg, Inc., *et al.*,[1] <br><br>                Debtors. | Chapter 11 <br><br> Case No. 17-01302-JJG-11 <br><br> (Joint Administration) |

**MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER
(I) APPROVING SETTLEMENT AGREEMENT WITH ELECTROLUX
HOME PRODUCTS, INC. AND (II) GRANTING RELATED RELIEF**

hhgregg, Inc. and its above-captioned affiliated debtors and debtors-in-possession (collectively, the "Debtors") and the official committee of unsecured creditors (the "Committee" and, together with the Debtors, the "Movants"), hereby move the Court (the "Motion") for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to section 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule B-9019-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Indiana (the "Local Rules"), approving a settlement by and among the Debtors, the Committee, Wells Fargo Bank, National Association ("Wells Fargo"), as the DIP Agent and Prepetition Agent,[2] GACP Finance Co., LLC ("GACP"), as the FILO Agent,[3] and Electrolux Home Products, Inc. ("Electrolux," and together with the Debtors, the Committee, Wells Fargo and GACP, the "Parties"), in resolution of two pending adversary proceedings (the "Settlement"

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: hhgregg, Inc. (0538); Gregg Appliances, Inc. (9508); HHG Distributing LLC (5875). The location of the Debtors' corporate headquarters is 160 West Carmel Drive, Suite 263, Carmel, IN 46032.

[2] As the DIP Agent and Prepetition Agent are defined in the Final DIP Order (defined below).

[3] As such term is defined in the Final DIP Order.

DB1/ 109856846.6

or "Settlement Agreement"). A copy of the Settlement Agreement is attached hereto as **Exhibit B**. In support of this Motion, the Movants respectfully state as follows

## PRELIMINARY STATEMENT[4]

1. Approval of the Settlement with Electrolux and the Debtors' lenders would resolve one of the most significant litigation matters still pending in these cases, maximize value for the Debtors' estates with an immediate cash infusion and establish a cornerstone on which the Movants can further liquidate assets and wind down these chapter 11 cases pursuant to a liquidating chapter 11 plan or otherwise.

2. As the Court is aware, the Electrolux litigation over competing rights to the Consigned Inventory and the proceeds it generated in the store liquidation sales has spanned over two and a half years. And with aggregate damages alleged by Electrolux in the neighborhood of $18 to $19 million, the litigation tied up substantial cash through several reserves and thus represented a crippling overhang to finally paying off the DIP Lenders and advancing the progression of these cases. To work past this logjam, over the last year the Parties made a concerted effort to reach a comprehensive resolution regarding claims related not only to Electrolux's action but also to the Debtors' counterclaims and the Committee's $26 million preference action against Electrolux. These vigorous, arm's length negotiations resulted in the Settlement, agreed to by the Debtors, Electrolux, the Committee and the Debtors' secured lenders.

3. The Settlement sets forth an equitable solution to the numerous claims at issue in the two adversary proceedings. If approved, the Debtors will gain access to over $3.7 million in formerly reserved cash to help pay down remaining secured indebtedness under the DIP Loans,

---

[4] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms in the balance of the Motion.

mutual releases, and the dismissal with prejudice of the Electrolux adversaries. Electrolux is slated to receive $3.5 million of the reserved cash, a $4 million administrative priority claim, and the dismissal with prejudice of the Committee's adversary proceeding and Debtors' counterclaims against Electrolux. Besides the immediate cash benefits, and taking measure of the estates' defenses (and those of the Debtors' lenders) and the potential exposure represented by the Electrolux action, the Movants firmly believe that the compromise reflected in the Settlement Agreement is well above the lowest point in the range of reasonableness and in the best interest of the Debtors' estates and creditors. Additionally, resolution of the Electrolux issues now has the added benefit of enabling the Debtors and/or the Debtors' lenders (who assert that they are entitled to indemnity from the Debtors) to bypass the likely tremendous expense posed in litigating the balance of Electrolux's fact-intensive claims that survived summary judgment.

4.  Based on the foregoing, and as set forth in more detail in this Motion, the Movants respectfully request that the Court enter an order approving the Settlement Agreement.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.  The statutory and legal predicates for the relief requested herein are section 105(a) of the Bankruptcy Code, Bankruptcy Rule 9019, and Local Rule B-9019-1.

## BACKGROUND

7.  On March 6, 2017 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the

Bankruptcy Code, the Debtors continue to operate their businesses and properties as debtors-in-possession. No trustee or examiner has been appointed in these cases.

8. On March 10, 2017, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

9. As of the Petition Date, the Debtors operated 220 brick-and-mortar stores offering furniture, appliances, and electronics in 19 states under the names hhgregg and Fine Lines. As of the date of this Motion, the Debtors have liquidated their store assets through going-out-of-business sales. The Debtors, together with the Committee, are in the process of monetizing all other material assets.

**A.      The Electrolux Adversary Proceeding.**

*The Consigned Inventory, Prepetition and DIP Financing, and GOB Sales*

10. The Electrolux adversary proceeding, in distilled terms, concerns the competing rights of Electrolux and the Debtors and/or the Debtors' lenders to the proceeds of the sale of certain goods received by the Debtors on consignment from Electrolux (the "Consigned Inventory") pursuant to a consignment agreement ("Consignment Agreement"). The Consigned Inventory largely consisted of consumer and commercial appliances under various Electrolux brand names.

11. The Consignment Agreement was entered into well before the Petition Date and all or substantially all of the Consigned Inventory at issue was received prior to such date. At the time the Consignment Agreement was entered, Electrolux filed a UCC-1 Financing Statement with the Indiana Secretary of State which purports to cover all inventory delivered to Gregg Appliances pursuant to the Consignment Agreement (the "Initial Financing Statement"). Electrolux filed continuation statements in 2006 and 2011, but it did not file a continuation

statement after 2011, causing the Initial Financing Statement to lapse on December 19, 2016, prior to the Petition Date. Electrolux filed a new financing statement on March 2, 2017, days prior to the Petition Date.

12. Also prior to the Petition Date, Wells Fargo, acting as administrative agent and collateral agent for certain financial institutions, entered into an amended and restated loan and security agreement with certain of the Debtors (the "Prepetition Loan Facility"). The Debtors granted Wells Fargo, as agent, a security interest in all or substantially all of the Debtors' property and assets, including inventory (including the Consigned Inventory) and the proceeds thereof. Approximately $56 million remained due and owing under the Prepetition Loan Facility as of the Petition Date.

13. Electrolux and Wells Fargo[5] are party to a prepetition intercreditor agreement (the "Intercreditor Agreement"). The Intercreditor Agreement, among other things, governed the relative rights—as well as the affirmative obligations—of Electrolux and Wells Fargo to the Consigned Inventory and the disposition of the proceeds (including credit card receipts) from the sale of such inventory.

14. After the Petition Date on March 7, 2019 and May 2, 2019, respectively, the Court entered interim and final orders (the latter, the "Final DIP Order") granting the Debtors authority to obtain up to $80 million in secured financing (the "DIP Loan," and together with the Prepetition Credit Facility, the "Loan Agreements") with Wells Fargo as the DIP Agent and the Prepetition Agent, and GACP as the FILO Agent for the lenders to the facility (the "DIP Lenders"). Under the Final DIP Order, the DIP Lenders were granted first priority priming liens and other security on all or substantially all of the Debtors' assets (the "DIP Liens"), and Wells

---

[5] As successor in interest to a prior agent.

Fargo (in its role as Prepetition Agent) was granted adequate protection in the form of replacement liens and other security second only to the DIP Liens.[6]

15.     On March 13, 2017, the Court entered separate interim orders authorizing the Debtors to, among other things, (i) conduct going-out-of-business sales for certain of its store locations and (ii) continue, maintain, implement new and/or terminate consignment arrangements in the ordinary course of business consistent with past practice.[7]  Following the entry of these orders, the Debtors commenced certain store liquidations and sold inventory, including the Consigned Inventory.  Electrolux did not receive any of the proceeds stemming from the sale of the Consigned Inventory.

16.     On December 12, 2017, the Debtors, the Committee (as acknowledging and consenting party), Wells Fargo and GACP entered into that Second Amendment to the Debtor-in-Possession Loan and Security Agreement (the "Second DIP Amendment").  Notice of the Second DIP Amendment was filed with the Court on December 14, 2018 [Main. Case Docket No. 2105].  Pursuant to the Second DIP Amendment, the parties thereto agreed to a "bucket system" and waterfall pursuant to which incoming receipts of the estate would be used to fund ongoing estate expenses, the repayment of the DIP Loan Obligations, professional fees and certain other administrative claims.  The Debtors have operated under the Second DIP Amendment, and have made disbursements consistent with its terms since it was entered nearly two years ago.

*The Electrolux Adversary Proceeding*

17.     Electrolux contested the sale of the Consigned Inventory and use of the proceeds to satisfy the Debtors' obligations under the Loan Agreements.  This took the form of Electrolux,

---

[6] GACP, as FILO Agent, and the FILO Lenders, closed on and fully funded their commitments under the DIP Loan on March 7, 2017 as contemplated and authorized by the interim DIP Loan order [Dkt. No. 50].

[7] On April 3, 2017, the interim consignment order was approved on a final basis.

on March 20, 2017, (i) filing a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtors' sale of the Consigned Inventory and/or dissipating the sale proceeds (which the Court ultimately denied); and (ii) commencing an adversary proceeding styled as *Electrolux Home Products, Inc., v. hhgregg, Inc., et al.*, Adversary Proceeding No. 17-50098, for declaratory relief and breach of contract related to the Consignment Agreement and the Intercreditor Agreement, and for other relief against defendants that included the Debtors and Wells Fargo, as the DIP Agent and Prepetition Agent (the "<u>Electrolux Adversary Proceeding</u>"). The Debtors counterclaimed for declaratory and other relief, including $1,767,566.25 in alleged contractual obligated payments and $25,452,595 in alleged preferential transfers, and Wells Fargo counterclaimed for declaratory and other relief, including alleged breach of contract.

18.     On March 28, 2017, following an evidentiary hearing, the Court denied Electrolux's request for a temporary restraining order, pursuant to which, among other things, Electrolux sought to prevent Debtors' ongoing sales of Consigned Inventory and/or to segregate the proceeds of such sales.

19.     On April 7, 2017, the Court entered a final order authorizing the Debtors to conduct going-out-of-business sales, including a "phase II" sale of the Debtors' remaining inventory that included the Consigned Inventory (the "<u>Final GOB Sale Order</u>"). Further, the Final GOB Sale Order provided that the DIP Lenders would segregate, based on the Debtors' reporting, certain proceeds equal to the value of Consigned Inventory sold following the date of the Final GOP Sale Order (the "<u>Electrolux Segregated Account</u>"). As of the date of this Motion, the Electrolux Segregated Account contains <u>$6,170,068.31</u>.

20. On April 12, 2017, the Court granted a motion filed by GACP as the FILO Agent to intervene in the Electrolux Adversary Proceeding.

21. Litigation in the Electrolux Adversary Proceeding continued apace for the balance of 2017 and 2018. This included separate summary judgment motions filed by the Debtors and Wells Fargo (to which GACP joined).

22. On May 31, 2018, the Court entered an order (the "Summary Judgment Order") granting in part and denying in part the motions for summary judgment. The Court denied summary judgement as to (i) Counts I and IV for declaratory relief against the Debtors and Wells Fargo, and breach of the Intercreditor Agreement by Wells Fargo regarding Electrolux's alleged ownership or superior postpetition rights to the Consigned Inventory and the proceeds thereof; (ii) Count III for breach of the Consignment Agreement by the Debtors; and (iii) Count VII for conversion by the Debtors and Wells Fargo.[8]

23. The Court granted summary judgment on Counts VI (constructive trust as to the Debtors and Wells Fargo), VIII (unjust enrichment as to Wells Fargo), X (estoppel as to the Debtors and Wells Fargo), XI (marshalling as to Wells Fargo), XII (third party beneficiary theory as to Electrolux under the DIP Loan), and XIII (waiver as to Wells Fargo).[9]

24. Following the Court's ruling on the summary judgment motions, the parties proceeded with discovery. Ultimately, a dispute arose with respect to the scope of discovery that should be permitted in light of the Summary Judgment Order. As of January 11, 2019, this discovery dispute was fully briefed by the Debtors, Wells Fargo and Electrolux. On multiple occasions, the Parties have continued court hearings on the discovery dispute due to the ongoing settlement negotiations.

---

[8] The Court held its ruling on Count XIV for reclamation pending resolution of the *Whirlpool* appeal in *Whirlpool Corporation v. Debtors, et al.*, Adversary Proceeding No. 17-50104.

[9] Electrolux previously voluntarily dismissed Counts II, V and IX.

*The Remaining Claims*

25.   On account of the remaining claims, Electrolux asserts that it is entitled to the turnover of all amounts in the Electrolux Segregated Account.  Additionally, Movants understand that Electrolux asserts that it has a claim for additional amounts, in excess of $12 million, that relate to the sales of Consignment Inventory prior to the date of the Final GOB Sale Order (i.e., prior to the date on which funds relating to such sales were required to be segregated).  Electrolux asserts these claims against both the Debtors and Wells Fargo.

26.   Wells Fargo asserts that its loan agreements with the Debtors entitle it to indemnification from the Debtors with respect to any claims asserted by Electrolux. Accordingly, if Electrolux were to succeed on its claims, the Debtors could be faced with (a) the turnover of the entirety of the Electrolux Segregated Account to Electrolux and (b) additional administrative claims by Electrolux or secured claims for indemnity by Wells Fargo of up to an additional $12 million.

**B.    The Committee Adversary Proceeding.**

27.   On November 17, 2017, the Committee, pursuant to authority provided in the Final DIP Order, filed a complaint styled as *Official Committee of Unsecured Creditors of Gregg Appliances, Inc. v. Electrolux Home Products, Inc. dba Frigidaire Consignment*, Adversary Proceeding Number 17-50284, to avoid and recover transfers to Electrolux pursuant to sections 547, 548, 549, and 550 of the Bankruptcy Code (the "Committee Adversary Proceeding").  The aggregate amount of transfers during the 90-day preference period identified in the Committee Adversary Proceeding is not less than $26,452,594.59, which amount does not account for potential defenses (including any new value and ordinary course defenses) that may be available to Electrolux.

**C.    The Proposed Settlement Resolving the Adversary Proceedings.**

28.    The Parties largely put the Electrolux Adversary Proceeding and the Committee Adversary Proceeding on a procedural hold since the beginning of 2019 in an extensive, multi-lateral effort to negotiate a consensual resolution. These efforts have finally succeeded, positioning the Debtors and the Committee to avoid the material burden, expense and uncertainty of litigating disputes the twin adversary proceedings each represent to the Debtors' estates and their creditors.

29.    In substance, the Settlement Agreement provides substantial upside for the Debtors' estates through mutual releases, dismissal of the Electrolux Adversary Proceeding and its attendant professional fee burn, and substantial funds released to the Debtors from the Electrolux Segregated Account and a Wells Fargo indemnity reserve account, funds which will be used to promptly retire obligations owed to GACP, as FILO Agent, and the FILO Lenders under the DIP Loan (and thus cut-off the accrual of interest and diminish other substantial fees and costs). For its part, Electrolux obtains certain immediate funds from the released Electrolux Segregated Account, dismissal of the Committee Adversary Proceeding and an administrative claim eligible for distributions under a third amendment to the DIP Loan (the "Third DIP Amendment") entered into in connection with the Settlement. A copy of the Third DIP Amendment is attached to the Settlement Agreement.

30.    A summary of these and other key provisions of the Settlement Agreement are as follows:[10]

- <u>Funds Released to Debtors</u>. The Debtors receive (i) $2,670,068.31 released from the Electrolux Segregated Account (the difference between the funds in the account and the $3.5 million paid to Electrolux), and (ii) $1,100,000 released from Wells Fargo's $2.5 million indemnity reserve

---

[10] The summary of the Settlement Agreement contained herein (including throughout the balance of the Motion) is for discussion purposes only, and in all cases, the terms of the Settlement Agreement itself shall govern.

account established under the DIP Loan, for an aggregate cash distribution of $3,770,068.31. The Debtors will apply these funds to retire indebtedness owed to GACP, as the FILO Agent under the DIP Loan, and to partially fund a requisite GACP indemnity reserve account pursuant to the terms of the DIP Loan as amended by the Third DIP Amendment (described further below).

- Electrolux Distributions. Electrolux receives (i) $3,500,000 in cash released from the Electrolux Segregated Account, and (ii) an allowed administrative priority claim in the amount of $4,000,000.

- Third DIP Amendment. In connection with the settlement, the Debtors, the Committee, GACP and Wells Fargo will agree to a Third Amendment to the DIP Loan that will amend the "bucket system" and disbursement waterfall agreed to pursuant to the Second DIP Amendment. Pursuant to the Third DIP Amendment, the priority administrative claim of Electrolux will be paid as follows: (a) $1.5 million will be paid, pro-rata, along with $2.6 million of accrued professional fees as part of a revised "Bucket 6," which will be funded with estate receipts received after the payment in full of the claims of the FILO Lenders and the funding in full of the GACP indemnity reserve of $250,000; and (b) the remaining $2.5 million of Electrolux's claim will be paid from a new "Bucket 7," which will be funded with the first receipts received by the estate after the funding of Bucket 6. The net effect of these provisions is that the $4 million Electrolux administrative claim will receive priority over all other administrative claims other than (y) certain administrative claims associated with Debtors' GOB Sales which were placed in Bucket 2 (which have fully been paid) and Bucket 5 pursuant to the Second DIP Amendment; and (z) $2.6 million of case professional fees funded in Bucket 6. The Debtors, the DIP Agent, the FILO Agent, and/or the Committee shall not enter into any further amendments to the Debtor-in-Possession Loan and Security Agreement that would have the effect of reducing or diluting in any way the Electrolux Administrative Claim (defined below) without the express written consent of Electrolux.

- Mutual Releases and Dismissal of the Adversary Proceedings. The Parties mutually release all claims in connection with the Electrolux Adversary Proceeding and the Committee Adversary Proceeding, each of which will be dismissed with prejudice upon the Settlement Effective Date.

- GACP Indemnity Reserve. In accordance with the terms of the DIP Loan, up to $250,000 will be used to establish a cash reserve for the benefit of GACP, as the FILO Agent, under the same terms and conditions governing the Wells Fargo indemnity reserve account referenced above. The GACP Indemnity Reserve (as defined in the Settlement Agreement) will be held by GACP in a segregated account and funded by $100,000

- from the $1.1 million released by Wells Fargo under its indemnity reserve account to the Debtors, and up to $150,000 from receipts received by the Debtors following the Effective Date of the Electrolux Settlement as the last dollars necessary to complete the funding of Bucket 4.

- <u>Terms Established to Release Reserve Accounts</u>.  Wells Fargo and GACP each agree to terms set forth in the Third DIP Amendment governing the release of the unused portions of their respective indemnity reserves to the Debtors upon the completion of certain case milestones that include the final resolution of any claims asserted against either party in *Whirlpool Corporation v. hhgregg, Inc. et al.*, Adversary Proceeding number 17-50104.

## **RELIEF REQUESTED**

31.     The Movants seek the entry of an order, pursuant to sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rule 9019 and Local Rule B-9019-1, (a) approving the Settlement Agreement attached hereto as **Exhibit B**, and the Settlement described therein, and (b) authorizing and empowering the Movants to settle the claims set forth herein, pursuant to the terms set forth in the Settlement Agreement, and to take all steps necessary to carry out and otherwise effectuate the terms, conditions, and provisions of the Settlement Agreement.

## **BASIS FOR RELIEF REQUESTED**

32.     Bankruptcy Rule 9019 provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee . . . and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

33.     In describing the standard for evaluating a settlement under Bankruptcy Rule 9019, the United States Court of Appeals for the Seventh Circuit has stated that settlements may be approved if they are in the best interests of the estate.  *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007).  A focal point of this analysis "is a comparison of the value of

the settlement with the probable costs and benefits of litigating." *Id*. A number of factors often considered by courts in evaluating a proposed settlement include the "litigation's probability of success, complexity, expense, inconvenience, and delay, including the 'possibility that disapproving the settlement will cause a wasting of assets.'" *Id*. (citations omitted).

34. The analysis under Bankruptcy Rule 9019 is <u>ultimately</u> whether the settlement at issue "falls below the low end [of the range] of possible litigation outcomes." *Id. See also*, *In re Holly Marine Towing, Inc.*, 669 F.3d 796, 801-02 (7th Cir. 2012) (holding that where one possible outcome was that the estate would receive nothing, a settlement giving it 50 percent of the value of the asset in question was reasonable).

35. While the Court must "determine whether the proposed [settlement] is fair and equitable and in the best interest of the estate[,]" the Court is not required to conduct a full evidentiary hearing regarding the propriety of settlement. *Depoister v. Mary M. Holloway Found*, 36 F.3d 582, 586-87 (7th Cir. 1994) (stating "[i]t is clear that Rule 9019(a) itself does not expressly obligate the court to hold an evidentiary hearing prior to approving a compromise under Rule 9019(a)."). Stated differently, in reaching a decision on whether to approve a settlement, the Court must make an informed and independent judgment but need not make an independent investigation of the facts, and it may give weight to the trustee's informed judgment and consider the competency and experience of counsel supporting the compromise. *Id*. at 587-88; *Matter of Rimsat, Ltd*., 224 B.R. 685, 688 (Bankr. N.D. Ind. 1997) (citations omitted).

36. The Movants endorse the Settlement as it is in the best interests of the Debtors' estates, their creditors, is fair and equitable, and falls easily within the reasonable range of possible litigation outcomes. The Electrolux Adversary Proceeding alone spans over two and a half years of litigation and the outcome remains uncertain post-summary judgment. Most of

Electrolux's material claims against the Debtors and/or the Debtors' lenders under the Consignment Agreement or Intercreditor Agreement, as well as defenses and the Estates' claims against Electrolus, remain alive. The aggregate amount of Electrolux's alleged damages related to the Consigned Inventory or the proceeds thereof are believed to range between <u>$18 to $19 million</u>. While not intended to remotely minimize the strength of the Debtors' defenses (or those of its lenders), litigation outcomes generally cannot be guaranteed and even a fifty/fifty judgment against the Debtors' estates would be deeply problematic to sustaining these chapter 11 cases for the benefit of other stakeholders. A judgment even more in favor of Electrolux would jeopardize repayment of the DIP Loan and likely render the Debtors' estates administratively insolvent, thus paving the way for the immediate conversion of these chapter 11 cases to cases under Chapter 7. This would undoubtedly wipe out any hope of a meaningful recovery for a substantial majority of the Debtors' other stakeholders, and likely foreclose <u>any</u> recovery for unsecured creditors.

37.  In addition, there is a risk that the Committee Adversary Proceeding will not work to hedge against an adverse Electrolux judgment. The gravamen of the Committee's complaint are prepetition transfers in the aggregate amount of $26.45 million that are subject to avoidance under section 547 of the Bankruptcy Code. Findings in favor of Electrolux in the Electrolux Adversary Proceeding may result in, by extension, equally favorable findings for Electrolux in the Committee's preference action. For instance, a finding that Electrolux owned or held superior rights to the Consigned Inventory and the proceeds thereof under the Consignment Agreement, the Intercreditor Agreement and/or applicable law may serve to immunize Electrolux from any preference exposure under section 547 of the Bankruptcy Code. If the outcome to the two adversary actions are tied together, the Debtors may not be able to offset an adverse Electrolux judgment in the Electrolux Adversary Proceeding against recoveries obtained

pursuant to the Committee's preference action. Moreover, Electrolux has asserted ordinary course and new value defenses to the preference demand.

38. The Settlement Agreement resolves the above uncertainty surrounding the Electrolux Adversary Proceeding. In particular, it provides the Debtors with cash payment of over $3.7 million to help retire existing secured indebtedness under the DIP Loan, coupled with the dismissal of the Electrolux action upon the Settlement Effective Date. The immediate cash infusion stabilizes the Debtors' balance sheet and positions the estates to ultimately satisfy all obligations under the DIP loan and thus make distributions to other creditors. The dismissal avoids costly and fact-intensive litigation during a sensitive time in the Debtors' cases. Indeed, in the absence of Settlement, the Debtors and other parties would have to promptly address a motion to compel discovery filed by Electrolux that has been pending for nearly a year. This and other protracted litigation to surely follow (up to and including trial and subsequent appeals) comes at tremendous expense to the Debtors' estates and creditors, both in terms of cost of the litigation itself and the disruption to ongoing efforts by the Movants to liquidate other assets and plan for the wind down of the Debtors' estates.

39. When combined with the agreed to Third DIP Amendment, the net effect of the settlement is to give priority status to the $4 million administrative claim granted to Electrolux as part of the settlement. Such priority is warranted, however, when one considers that, by agreeing to the settlement, Electrolux is foregoing its claim to (a) over $2.6 million in cash currently sitting in the Electrolux Escrow Account and (b) up to an additional $12 million in damages against Wells Fargo that, if successful, could result in secured claims against the estate for any amount recovered. By treating Electrolux's compromised claims as priority administrative claim that will be paid by the Debtors in the future, the Electrolux Settlement frees up cash out of the

Electrolux Escrow and the Wells Fargo Indemnity Account that can be used by the Debtors today to pay down interest bearing DIP Loan claims of the FILO Agent.

40.     For the foregoing reasons, the Movants have determined that the Settlement is fair, equitable, in the best interests of the Debtors' estates, and well within the range of reasonableness for approval under Bankruptcy Rule 9019(a). Accordingly, the Movants respectfully submit that the Court should approve the Settlement Agreement.

## NOTICE

41.     Notice of this Motion will be separately provided to: (i) the U.S. Trustee; (ii) counsel to Wells Fargo Bank, National Association, c/o John F. Ventola, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (jventola@choate.com); (iii) counsel to GACP Finance Co., LLC, c/o Stuart M. Brown, DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 (stuart.brown@dlapiper.com); and (iv) all parties that, as of the filing of this Notice, have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Movants submit that no other or further notice is necessary.

**WHEREFORE**, the Movants respectfully request that the Court enter the Proposed Order, substantially in the form attached as **Exhibit A**, granting the relief requested herein and granting all other just and proper relief.

Dated: November 25, 2019

Respectfully submitted,

| | |
|---|---|
| **COOLEY LLP** | **MORGAN, LEWIS & BOCKIUS LLP** |
| Cathy Hershcopf | Craig A. Wolfe |
| Summer M. McKee | Andrew J. Gallo |
| 55 Hudson Yards | 101 Park Avenue |
| New York, NY 10001 | New York, NY 10178 |
| Telephone: (212) 479-6000 | Telephone: (212) 309-6000 |
| chershcopf@cooley.com | craig.wolfe@morganlewis.com |
| smckee@cooley.com | andrew.gallo@morganlewis.com |
| | |
| -and- | -and- |
| | |
| **BINGHAM GREENEBAUM DOLL LLP** | **ICE MILLER LLP** |
| Thomas Scherer (No. 24-49) | Jeffrey A. Hokanson (No. 14579-49) |
| Whitney Mosby (No. 23691-49) | One American Square, Suite 2900 |
| 2700 Market Tower | Indianapolis, IN 46282-0200 |
| 10 West Market Street | Telephone: (317) 236-2100 |
| Indianapolis, IN 46204 | Jeff.Hokanson@icemiller.com |
| Telephone: (317) 635-8900 | |
| | By: /s/    *Jeffrey A. Hokanson* |
| *Counsel to the Official Committee of Unsecured Creditors* | Jeffrey A. Hokanson (admitted pro hac vice) |
| | One American Square, Suite 2900 |
| | Indianapolis, IN 46282-0200 |
| | Telephone: (317) 236-2100 |
| | Jeff.Hokanson@icemiller.com |
| | |
| | *Counsel to the Debtors and Debtors in Possession* |

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2019, I electronically filed the foregoing. Notice of this filing will be sent to the parties who have requested to receive notice through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

/s/ *Jeffrey A. Hokanson*
Jeffrey A. Hokanson

DB1/ 109856846.6